AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| 07/10/2020 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___ dj ___ DEPUTY |

United States of America

v.

Dustin Delacruz,

Defendant(s)

Case No.   20-MJ-3198

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 8, 2020 in the county of San Luis Obispo in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
Brian Sullivan, Special Agent
*Complainant's signature*

_____
Brian Sullivan, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:          July 10, 2020

City and state:   Santa Barbara, California

_____
*Judge's signature*

Hon. Louise A. LaMothe, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Brian Sullivan, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant against DUSTIN DELACRUZ ("DELACRUZ") for a violation of 21 U.S.C. §§ 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search 750 Shorthorn Court, Paso Robles, California, 93446 (the "SUBJECT PREMISES") as described more fully in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm), 922(a)(1)(A) (engaging in the business of dealing in firearms without a license), and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been employed as such since January 2003.  I am currently assigned to the Los Angeles Field Office, Central Coast Safe Streets Taskforce ("CCSSTF").  CCSSTF is a Task Force comprised of agents and officers from federal, state, and local agencies, who are assigned to investigate gang-related crimes and large-scale drug trafficking matters.  I have participated in numerous investigations involving violations of federal firearms and drug laws and participated in the execution of numerous arrest and search warrants.  I have also participated in the interviews of defendants, informants, and witnesses who had personal knowledge of firearm and drug trafficking methods.  Additionally, I have conducted surveillance and participated in investigations using confidential informants and undercover agents to make controlled purchases of drugs and firearms from members of drug traffickers and criminal street gangs.  Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by drug traffickers to manufacture drugs, smuggle

and safeguard drugs, distribute drugs, and collect and launder
proceeds related to the sales of drugs.  I am familiar with the
methods employed by gang members to thwart detection by law
enforcement, including the use of cellular telephone technology,
counter-surveillance techniques, false or fictitious identities
and addresses, money-laundering techniques, and coded language.

6.    From the foregoing training and experience, I am
knowledgeable about the means and methods of illegal firearm
possession, illegal drug distribution, the workings of criminal
street gangs, and the ways in which digital devices are used to
facilitate and conceal drug-trafficking and firearms crimes.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On June 25, 2020, DELACRUZ sold a Confidential Human
Source ("CHS") working with the FBI approximately 8 grams of
suspected methamphetamine and a non-serial-numbered short-barrel
rifle (a "Ghost Gun"), loaded with a 30-round magazine, at the
SUBJECT PREMISES.[1]  DELACRUZ was a convicted felon at the time he
sold the Ghost Gun and loaded magazine to the CHS.  Law
enforcement separately confirmed that DELACRUZ lives at the
SUBJECT RESIDENCE based on a search of law enforcement
databases, including records from the California Department of
Motor Vehicles.

---

[1] The CHS is being paid to work with law enforcement.  The
CHS has a number of prior misdemeanor convictions, including for
disorderly conduct, driving under the influence, possession of a
controlled substance, petty theft, and possession of stolen
property.  The CHS also has prior felony convictions for
burglary, possession of a stolen vehicle, and narcotics.

8.    On July 8, 2020, DELACRUZ was arrested by the Atascadero Police Department for various California Vehicle Code violations and evading law enforcement.  During the search of his person subsequent to arrest, officers found approximately 31.5 grams of suspected methamphetamine and 51.1 grams of suspected heroin on is person.[2]

### IV. STATEMENT OF PROBABLE CAUSE

9.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    DELACRUZ Sells Methamphetamine and a Firearm to the CHS at the SUBJECT PREMISES on June 25, 2020**

10.    On or about June 23, 2020, the CHS attended a party where K.F. was one of the invited guests.  K.F. asked several of the attendees, including the CHS, if they were interested in purchasing any firearms.  K.F. showed the CHS several photographs of firearms that their mutual friend, DELACRUZ, was selling.  K.F. instructed the CHS to contact DELACRUZ directly if the CHS was interested in purchasing the firearms.  The CHS described the firearms in the photographs as an AR-15 rifle and a tan Glock-style pistol.

11.    On or about June 25, 2020, the CHS contacted DELACRUZ via Facebook Messenger for the purpose of purchasing drugs and firearms.  Later the same day, the CHS met DELACRUZ in a public place and DELAZCRUZ instructed the CHS to follow him to his house to complete the sale.  The CHS began following DELACRUZ to

_____

[2] The 51.1 grams of suspected heroin includes packaging weight.

4

his house; however, during the lengthy drive the CHS lost sight of him and contacted him via Facebook Messenger.  DELACRUZ replied via Facebook Messenger by sharing his location and writing, "The address is 750 shorthorn ct Paso robles."

12.  Before sending the CHS to the SUBJECT PREMISES, I searched the CHS and his/her car, and set up multiple audio and video recording devices.

13.  Based on my review of the video recordings and my conversations with the CHS, I know the following:

a.  At approximately 4:07 PM, DELACRUZ approached the CHS's car parked at the public place where had they agreed to meet.  DELACRUZ told the CHS he has two to sell (referring to firearms), and the prices are non-negotiable.  DELACRUZ specified to the CHS he has a Glock 40 for sale, which is fully automatic ready with a threaded barrel for a silencer, and an AR-15 pistol made of cast aluminum parts, with three scopes and clips.  DELACRUZ stated to the CHS that the price for the AR-15 is $1,250, and the handgun is $1,100.  The CHS asked DELACRUZ if he has any "crap" (methamphetamine) and DELACRUZ replied, "I have some right now, I have a little bit crap right now."[3] DELACRUZ agreed to sell the CHS a firearm and methamphetamine, and instructed the CHS to follow him to his house.

b.  The CHS followed DELACRUZ to his house and saw DELACRUZ waiting for the CHS in the driveway.  DELACRUZ led the

_____

[3] I have translated certain words of coded language or street slang related to narcotics based on my training and experience. My translations, based on my training and experience, and information obtained from the CHS, appear as parentheticals following the translated word.

CHS into the garage and introduced the CHS to J.R., who was sitting in the garage.   The CHS followed DELACRUZ to his bedroom, which was located inside garage.   DELACRUZ opened a "pelican style" case, removed an AR-15 lower assembly, and then attached the barrel forming the short barrel rifle.   DELACRUZ then inserted a 30-round magazine into the firearm and asked the CHS, "What are you wanting em' for?"   The CHS replied, "cuz I'm into guns, why do you think."

c.   The CHS examined the firearm while DELACRUZ looked around his bedroom for the other firearm (Glock 40). DELACRUZ asked J.R., "you didn't see the other one?"   DELACRUZ eventually told the CHS if he finds the other one and if he really wants to part with it, he will let CHS know.   DELACRUZ stated, "It's the first one I ever made and it is sick as fuck."

d.   The CHS asked DELACRUZ, "How much is this one," and DELZCRUZ replied, "1,250."   DELACRUZ told the CHS, "I have crap right now and I can get black, black is fire dude."   The CHS asked DELACRUZ how much white do you got," (methamphetamine) and DELACRUZ replied, "I got like a half ounce but I have to give my mom some."   Delacruz left the bedroom and said, "hold on, let me get it real quick."

e.   Approximately one minute later, DELACRUZ returned to the bedroom with a small baggie containing a white substance inside in his hand.   DELACRUZ bit the knot on the baggie in an effort at opening it.   DELACRUZ stated, "here [J.R.], here, is that enough, or is that too much" and handed J.R. what appears to be the contents of the small baggie.   DELACRUZ stated, "yeah

I know, but you don't just give it to him." J.R. replied,
"whatever, I'm just going to take it off whenever he works for
me here." DELACRUZ then asked, "Do you have a scale [J.R.]?"
J.R. replied, "no, I gave them all to you."

       f.  DELACRUZ weighed the drugs on the digital scale
by the CHS, and the CHS stated, "1/4 ounce." DELACRUZ replied,
"so I'll sell you the quarter for 100." The CHS adds aloud the
price of the two items and states, "1,350." As DELACRUZ bagged
the methamphetamine, he stated, "yeah I'm going to give [K.F.]
some money for hooking it up, hooking the deal up and shit."

    14.  After the CHS left the SUBJECT PREMISES, I searched
the CHS and his/her car and collected the drugs, firearm and
recording devices.

    15.  After collecting the firearm as evidence from the CHS,
I recognized the firearm as a non-serial numbered "Ghost Gun"
with an untraceable lower receiver. The firearm is a "Short
Barrel Rifle," meaning a shoulder-fired, rifled firearm, with a
barrel length of less than 16 inches and an overall length of
less than 26 inches.

    16.  Later that same day, at approximately 5:57 PM, and in
the presence of the investigating Special Agents, DELACRUZ
contacted the CHS via cell phone and stated he had found the
other firearm he wished to sell to the CHS. DELAZCRUZ sent the
CHS a text message photograph of the firearm and told the CHS he
wanted $1,050. The photograph DELAZCRUZ sent the CHS was of a
Glock style, tan in color, pistol.

17.   On July 1, 2020, the drugs were shipped to the Drug Enforcement Administration, Southwest Laboratory, for chemical analysis, testing, and weighing.  The tests are still pending. Based on my training and prior experience with narcotic investigations, the substances provided by DELACRUZ to the CHS is likely methamphetamine based on the appearance of the substances and the circumstances of the deal, which involved DELACRUZ weighing the items and selling to the CHS.  Moreover, based on my training and experience, the amount of money paid by the CHS for the substances is consistent with rates typically charged for such quantities of methamphetamine.

18.   On July 8, 2020, the CHS was debriefed and asked if the weapon purchased from DELACRUZ and photograph sent to the CHS by Delacruz matched the photographs of weapons for sale K.F. showed the CHS on or about June 23, 2020.  The CHS advised the weapon purchased from DELACRUZ and the photograph of the other weapon for sale by DELACRUZ did in fact appear to be the same weapons K.F. previously showed the CHS.

**B.   DELACRUZ Is Arrested For Evading Law Enforcement and Is Found In Possession of Additional Methamphetamine and Heroin**

19.   On July 8, 2020, DELACRUZ was arrested by the Atascadero Police Department for various California Vehicle Code violations, and for evading law enforcement.  In particular, after a law enforcement officer activated his overhead red and blue lights, DELACRUZ initially attempted to evade law enforcement by driving his motorcycle on the 101 South Highway in speeds of excess of 100 miles per hour.  After a second

officer joined the pursuit, DELACRUZ exited the highway and drove through a red light, several stop signs, and through the wrong lane of traffic.  Eventually, DELACRUZ abandoned the motorcycle and attempted to continue to flee on foot.  At the conclusion of the pursuit, DELACRUZ was arrested.

20.  Subsequent to arrest, the arresting officers searched DELACRUZ's person and located a black marijuana cookie bag, two small zip-lock style baggies containing an unknown white crystalline substance, and five syringes.  Further examination of the black marijuana cookie bag revealed an additional three smaller baggies of suspected narcotics: one being a small baggie containing an unknown white crystalline substance; the second a small baggie containing a white powdery substance; and the third a small baggie containing a brown powdery substance.

21.  Subsequent to arrest, officers learned that DELACRUZ had a suspended license and was currently on bond for a different arrest.

1.   Post-Miranda Interviews

22.  During a post-Miranda interview, DELACRUZ initially claimed that he was not sure why he fled from police and further claimed that he did not know who owned the drugs and related paraphernalia found on his person.  Later on, DELACRUZ told an officer that he fled from police because his license was suspended.  DELACRUZ also admitted that he uses both methamphetamine and heroin.

### 2.   Field Test of Seized Drugs Tests Positive for Methamphetamine

23.   On July 9, 2020, one of the three baggies containing the unknown white crystalline substance was field tested using a NARK II (Narcotics Analysis Reagent Kit) specifically designed for a methamphetamine/MDMA reagent.  The results of the field testing were positive for methamphetamine, with an estimated combined weight of approximately 31.5 grams.[4]  All of the seized suspected narcotics will be submitted to the DEA Southwest Laboratory for additional testing and evaluation.

**C.   Criminal History**

24.   On July 9, 2020, I reviewed DELACRUZ's criminal history records and learned that DELACRUZ appears to have previously been convicted of the following felony crimes:

a.   Unlawful Taking or Driving of Vehicle, in violation of California Vehicle Code § 10851(A), on or around November 17, 2003;

b.   Forgery, in violation of California Penal Code § 470(d), on or around May 7, 2004;

c.   Possessing a Controlled Substance for Sale, in violation of California Health & Safety Code § 11378, on or around September 29, 2005;

d.   Being a Felon in Possession of a Firearm, in violation of California Penal Code § 12021(a)(1), on or around September 29, 2005;

---

[4] The suspected heroin was not field tested.  The gross weight of the suspected heroin, including packaging, was 51.1 grams.

e.    Receiving Stolen Property, in violation of California Penal Code § 496(a), on or around August 7, 2007;

f.    Possessing a Controlled Substance While Armed, in violation of California Health & Safety Code § 11370.1(a); and

g.    False Imprisonment, in violation of California Penal Code § 236, on or about April 18, 2016;

25.   I have requested certified conviction documents for DELACRUZ's felony convictions.

**D.    Investigation of the SUBJECT PREMISES**

26.   On or about June 25, 2020, I conducted a search of law enforcement databases for the SUBJECT PREMISES and learned DELACRUZ is the listed resident of that address.  Moreover, based on my review of the video recording of the transactions and review of DELACRUZ's DMV photograph, I believe the photograph of DELACRUZ matches the man who appears in the video recordings of the June 25, 2020 drug and firearm sale.

27.   TFO David Smith performed a San Luis Obispo Sheriff's Office database search for DELACRUZ, including records from the California Department of Motor Vehicles, and confirmed that DELACRUZ resides at the SUBJECT PREMISES.

**V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES**

28.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and

deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences.

c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

d.   Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices and in their residence.  Drug traffickers

12

often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often

prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

29. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This

includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

      d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[5]

30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

       a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

       b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

32.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

33.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

18

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress DELACRUZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of DELACRUZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

34. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.   REQUEST FOR NIGHTTIME SERVICE

35. I request that the Court authorize investigators to serve this warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  Good cause for nighttime service exists because as discussed above, DELACRUZ, as well as others at the SUBJECT RESIDENCE, are involved in sales of methamphetamine and drug traffickers often use firearms to protect their drugs and drug proceeds.  Moreover, I am aware from my investigation that the houses to be searched have previously contained firearms.  If law enforcement were to execute this warrant during the daytime, it would be very difficult to evade detection and would, thus, pose a risk for officer safety.  Given the holding set forth in Gooding v. United States, 416 U.S. 430 (1974), that there is no need for the presence of exigent circumstances in narcotics cases to justify a nighttime search, I believe that nighttime service is similarly warranted in this case involving repeated drug sales.

## IX. <u>CONCLUSION</u>

36.   For all of the reasons described above, there is probable cause to believe that DELACRUZ has committed a violation of 21 U.S.C. §§ 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1 and the person of DELACRUZ described in Attachment A-2.


_Brian J. Sullivan, Special Agent, FBI_
Brian J. Sullivan
Special Agent, FBI


Subscribed to and sworn before me
this  10th  day of July, 2020.


THE HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE

FINDING RE PROBABLE CAUSE

On __July 10, 2020__, at __2:45__ a̶m̶/p.m., Agent Brian Sullivan of the Federal
Bureau of Investigation telephonically appeared before me regarding the
probable cause arrest of defendant DUSTIN DELACRUZ, occurring on or about
July 10, 2020, at Los Angeles, California.

Having reviewed the agent's statement of probable cause, a copy of which
is attached hereto, the Court finds that there **exists/does not exist**
probable cause to arrest the defendant for a violation of Title 21, United
States Code, Section 841(a)(1).


/__X__/ It is ordered that defendant DUSTIN DELACRUZ
be held to answer for proceedings under Federal Rule of Criminal Procedure
5 / 40 on __July 10, 2020__.


/____/ It is ordered that defendant DUSTIN DELACRUZ
be discharged from custody on this charge forthwith.


DATED: __July 10, 2020__, at __2:45__ a̶x̶x̶x̶/p.m.


_Louise A. Callothe_
UNITED STATES MAGISTRATE JUDGE LOUISE A. LAMOTHE